**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**DARIOUS PHILLIPS,**<br>**Defendant.** | **Case No. 25-CR-250 (SLS)** |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

On August 21, 2025, Defendant Darious Phillips was carrying a loaded Masterpiece Arms Mac9 semi-automatic pistol equipped with an extended magazine and loaded with 19 rounds of ammunition, including one in the chamber, around a densely populated area of Southeast D.C. This arrest represented the *second* time he carried a loaded firearm *while on supervised release for a 2018 shooting where the Defendant shot a man multiple times*.

Given the Defendant's repeated unlawful possession and use of firearms in the District of Columbia and his history of escalating violence, the United States recommends a sentence of 41 months of incarceration followed by 36 months of supervised release. In addition, the Government requests that the firearms and ammunition identified in the parties' plea agreement be forfeited.

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On August 23, 2025, the Defendant was charged via complaint with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g). On August 27, 2025, a federal grand jury sitting in Washington, D.C. indicted the Defendant on the same charge. On September 23, 2025, the Defendant appeared for arraignment and, through counsel, communicated his desire to accept responsibility and plead guilty to the sole count in the Indictment. Following a colloquy with the Defendant, this Court accepted the guilty plea on

November 6, 2025 pursuant to a written agreement. The accompanying statement of offense was as follows:

**25-cr-250 (SLS)**

1. At approximately 8:30 p.m., on August 21, 2025, members of the Metropolitan Police Department's Robbery Suppression Unit and other law enforcement agencies were patrolling the 4000 block of South Capitol Street, SW.

2. Law enforcement officers were in marked and unmarked cars. The defendant was walking northbound on South Capitol Street with a woman when he appeared to notice the cars. He then pulled the woman he was with closer to his person, placed his right hand into his right jacket pocket, and made a downward pushing motion. The defendant then started walking away at a faster pace.

3. When two law enforcement officers got out of their car, the defendant immediately started running northbound on South Capitol Street. As he was running, other law enforcement agents saw the defendant remove a black firearm with an extended magazine and hold it in his right hand while running in the middle of a public sidewalk. He then made a tossing motion and continued to run. Law enforcement officers ultimately stopped him shortly thereafter.

4. Once the defendant was apprehended, law enforcement officers canvassed the flight path where he was observed making the tossing motion. Police recovered the firearm they had just seen the defendant holding and running with in the defendant's flight path approximately two minutes after the pursuit, just feet away from where the defendant had been running.

5. More specifically, the firearm the defendant possessed was a Masterpiece Arms model Mac9, semi-automatic pistol, which was chambered with one round of 9mm ammunition and 18 additional rounds in a high-capacity magazine.

6. There are no firearm or ammunition manufacturers in the District of Columbia. Therefore, the firearm and ammunition in this case would have traveled in interstate commerce prior to being recovered in the District of Columbia.

7. The defendant was previously convicted in D.C. Superior Court of Aggravated Assault while Armed in case no. 2018 CF1 017601, and was sentenced to five years' incarceration, followed by five years of supervised release. The defendant knew that he had a prior conviction for a crime punishable by more than one year of imprisonment.

**<u>2025 CF2 007453</u>**[1]

1. On October 9, 2024, at approximately 9:30 p.m., Sergeants Davies and Decker with MPD responded to a ShotSpotter detection in the area of 504 Lebaum Street SE, Washington D.C. Upon arriving at the location, the sergeants were greeted by two unidentified witnesses who told them "You'll see them further down on the sidewalk, you can't miss them." A separate unidentified witness approached the sergeants' cruiser and said "you can't miss them it's a female with a stroller and a male."

2. The sergeants then turned onto MLK Jr. Ave and near the intersection of MLK Jr. Ave and Mellon Street, at which point they saw a man (Darious Phillips) and a woman (Danielle Snowden) pushing a baby stroller.

3. As the sergeants approached, the defendant separated from Snowden and the baby stroller and walked at a hurried pace in the opposite direction. Before doing so, the defendant handed Snowden a black, Polymer 80, 9mm semiautomatic firearm, with no serial number, loaded with one round of 9mm in the chamber, and seven rounds of 9mm ammunition in the magazine. The defendant had previously, knowingly carried this firearm on his person while walking with Snowden.

4. The sergeants later detained the defendant after he had separated from Snowden. During the defendant's detention, the sergeants patted him down upon obtaining his consent, but did not locate a firearm and subsequently released him.

5. The sergeants also detained Ms. Snowden and, after speaking with her and her denying that the defendant provided her with the firearm, noticed the grip of the firearm in question protruding from her jacket pocket. Upon seeing this, the officers seized the firearm from her pocket. Ms. Snowden later admitted that her child's father – the defendant – had given her the firearm.

*See* ECF No. 13.

## II. DISCUSSION AND APPLICATION OF U.S. SENTENCING GUIDELINES AND 3553(a) FACTORS

When determining the appropriate sentence, the district court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). See *United States v. Gall*, 552 U.S. 38, 49-50 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

[1] The Government agreed to dismiss the charges against the Defendant in Superior Court case 2025 CF2 007453 as part of the plea agreement. The Defendant has agreed that those charges were based in fact. *See* ECF No. 12.

> (2) the need for the sentence imposed –
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for –
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –
> >
> > > (i) issued by the Sentencing Commission ...; and
> > >
> > > (ii) that, . . . are in effect on the date the defendant is sentenced; ...
>
> (5) any pertinent policy statement –
>
> > (A) issued by the Sentencing Commission ... and
> >
> > (B) that, . . . is in effect on the date the defendant is sentenced.
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

While the U.S. Sentencing Guidelines are no longer binding, they should inform the Court's approach to fashioning a sentence that will effectuate the aforementioned goals in § 3353(a). This is so because, as the Supreme Court has recognized, the Guidelines themselves

"seek to embody the § 3553(a) considerations, both in principle and in practice." *See Rita v. United States*, 551 U.S. 338, 350 (2007). As the Court elaborated, given the difficulties in balancing the "abstract and potentially conflicting nature of § 3553(a)'s general sentencing objectives, and the differences of philosophical view among those who work within the criminal justice community as to how best to apply general sentencing objectives, it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* And the sentencing court can consider conduct by a defendant that was not charged or even for which a defendant was acquitted. *See United States v. Settles*, 530 F.3d 920, 923 (D.C. Cir. 2008) ("[L]ong-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proven by a preponderance of the evidence and the sentence does not exceed the statutory maximum for the crime of conviction.").

A. Guidelines Calculations

The Presentence Investigation Report ("PSR") estimates the Defendant's base offense level to be 22. PSR at ¶ 14. Because the Defendant demonstrated acceptance of responsibility for the offense and assisted the authorities by timely notifying them of his intent to plead guilty, he should receive a three-level decrease from his base offense level for acceptance of responsibility pursuant to § 3E1.1. PSR at ¶ 22. Thus, his Total Offense Level is 19.

The Defendant has only one criminal conviction that scores for purposes of calculating the Defendant's criminal history category under the Sentencing Guidelines: his 2018 Aggravated Assault while Armed conviction in D.C. Superior Court, which counts for three criminal history points. With a total of three criminal history points, the Defendant falls into Criminal History Category II.

The Defendant's total offense level is 19 and he is in Criminal History Category II, resulting in a Sentencing Guidelines range of 33-41 months. The Guidelines range is in "Zone D," wherein only a sentence of incarceration would comply with the Guidelines.

B. <u>The Government's Sentencing Recommendation</u>

The Defendant has continuously possessed loaded firearms throughout his time in the community, and has demonstrated his willingness to use them. Only a sentence at the top of the Defendant's Guidelines range will adequately address the factors Congress set forth in § 3553(a), in particular due to the nature and seriousness of the offense when considered with the history and characteristics of the Defendant.

*1. Nature and Seriousness of the Offense*

Carrying any firearm in a densely populated urban area poses risks to public safety, but the Defendant, a convicted felon who has shot someone before, represents an even more serious threat. Furthermore, the gun that the Defendant carried in the instant case was a semi-automatic handgun chambered with one round and had an extended magazine with 18 more rounds in it:




**Figure 1– MA Mac9**

The Defendant also showed a disregard for the safety of those around him when he pulled the gun out and threw it while fleeing from police. As set forth in the Statement of Offense, when approached by law enforcement, the Defendant not only fled, but proceeded to remove the loaded semi-automatic weapon from his waistband and run with it for a period of seconds, while other individuals were in and around the area walking on the 4000 block of South Capitol St. SE. The Defendant's decision to take out his firearm, raise his hand, and then ultimately throw the firearm could have led to any number of dangerous scenarios, including law enforcement officers potentially discharging their own weapons in fear for their safety or the Defendant's recently discarded firearm accidentally discharging upon hitting the ground.

Furthermore, to be clear, the Defendant has admitted that the August 21, 2025 incident took place less than a year after he was caught in possession of another firearm (a ghost gun)—all while he was still on supervised release for the 2018 offense where the Defendant shot his victim multiple times. As made clear in prior filings and the Statement of Offense, in October 2024, officers with the Metropolitan Police Department ("MPD") responded to the 500 block of Lebaum Street SE, Washington, D.C. in response to the sound of shots fired. Upon arriving, a witness told the officers to look for "a female with a stroller and a male." Officers identified the man (Darious Phillips) and woman (Danielle Snowden) pushing a baby stroller shortly thereafter nearby. As they approached, Phillips and Snowden quickly separated from each other and walked in different directions. Officers detained Phillips first and patted him down, finding nothing because he had already given the firearm to Snowden.




**Figure 2 – Snippet from Officer Body-Worn Camera**

The sergeants then caught up to Snowden, who was still pushing the stroller. When Sgt. Davies approached, he asked Snowden if the man she was just with had given her a gun. Snowden stated that he did not. While speaking with Snowden, Sgt. Davies observed the grip of a pistol in Snowden's unzipped front left jacket pocket:



**Figure 3 – Photograph of Co-Defendant Snowden**

Officers placed Snowden into handcuffs and recovered the pistol from her jacket pocket. Snowden proceeded to tell officers that her baby's father, Darious Phillips, put the gun in her jacket pocket and that she does not carry guns. She further stated she did not know the object he gave her was a gun because things were happening too fast. The recovered firearm was a Polymer 80 ghost gun loaded with 7 rounds in a 12-round magazine with a round in the chamber.




**Figure 4 – Photograph of Firearm Recovered from Co-Defendant Snowden**

The Defendant was later indicted for his possession of this firearm and ammunition in July 2025 by a grand jury for D.C. Superior Court, but he had not been arrested and arraigned on that Indictment until he was arrested in August 2025 for the instant offense.

While the Defendant's offenses are possessory offenses that did not involve violence, this hardly undermines how significant the possession of these firearms was both in his hands and in the context of the wider issue of gun violence in Washington, D.C. To the extent the Defendant wishes to argue the firearm was for "his protection" given the dangerousness of the neighborhoods he frequents, the Government would note that the Defendant's possession of a fully loaded Mac 9

with 19 total rounds belies the notion that the weapon's purpose was defensive. The firearm in the 2024 incident is perhaps even worse. The firearm lacked a serial number and was therefore unregistered and untraceable, posing particular problems for public safety. The U.S. Sentencing Commission has recognized the particularly pernicious nature of such firearms and amended § 2K2.1 to include a *four-level enhancement* to the base offense level if the firearm involved was a ghost gun. *See* U.S. Sentencing Comm'n, Amendments to the Sentencing Guidelines, April 27, 2023, pp. 60-61.

*2. History and Characteristics*

The Defendant has a troubled criminal history involving reckless behavior and escalating violence that is not fully captured by his criminal history category. This criminal history makes clear that a significant period of incarceration is both appropriate and necessary to punish the Defendant for his repeated criminal acts and to protect the community.

The Defendant has exhibited serious criminal conduct since a young age. PSR at ¶ 25. This conduct has unfortunately become a pattern. In 2012, when the Defendant was 21, he was arrested and charged after attempting to evade police, causing an officer to reach speeds of up to 110 miles per hour in order to keep up with the Defendant. PSR at ¶ 26. The Defendant drove dangerously and without a license, initially resisted arrest, and was severely inebriated. After being apprehended, a breathalyzer revealed his blood alcohol concentration to be 0.196—over double the legal limit. *Id.*

Then, in 2018, the Defendant shot a man three times, apparently as a result of a verbal altercation outside a gas station. PSR at ¶ 27. The Defendant pleaded guilty and was sentenced to 60 months in prison, followed by 60 months of supervised release. *Id.* The Defendant was released from custody on March 1, 2023, and has violated his supervised release over ten times, culminating

in his arrest for the instant offense. *Id.* The Defendant has also failed to report on three occasions, failed to report for drug testing on two occasions, and tested positive for alcohol on seven occasions between July 26, 2023, and November 24, 2023. *Id.*

The Defendant's decision to unlawfully carry a semi-automatic firearm is even more dangerous when considering his criminal history of reckless and violent actions, as well as his substance abuse. The Defendant's history of violent actions, evading the police, and failing to cooperate with the terms of his supervision, warrant the requested sentence of incarceration at the top of the applicable guidelines.

The Defendant undoubtedly endured a difficult upbringing that has impacted him and very likely has contributed to his own pattern of criminal behavior. PSR at ¶¶ 41-52. The Defendant could have learned from those experiences and chosen a different path, but unfortunately, he has not done so to date. His first-hand experiences with the effects of gun violence should have impressed upon the Defendant the devastating effects of gun-related crime. Instead, the Defendant has chosen to perpetuate a cycle and to continue participating in dangerous and criminal activities that put him, his family, and the community at risk.

*3. The Need for the Sentence Imposed*

The requested sentence is sufficient but no greater than necessary to meet the goals of sentencing. The sentence provides specific deterrence: it will keep our community safe from the Defendant for a significant period of time and deter the Defendant from the illegal possession of firearms upon his eventual release. The sentence also provides general deterrence: it will signal to the community that the illegal possession of firearms is a deadly serious matter and will demonstrate a punishment that will deter others in the community from doing so.

A 41-month sentence would appropriately reflect the Defendant's history of criminal conduct, adequately punish him for his current conduct, and would deter him from continuing to engage in such conduct. The Defendant has a criminal history that spans various years and points in his life. His previous time in prison, as well as supervised release, have seemingly done little to deter him. Therefore, a sentence at the top of the applicable guidelines is necessary to adequately punish the Defendant and protect the community.

## III. CONCLUSION

For all the foregoing reasons, the Government respectfully requests that the Court impose a sentence of 41 months of incarceration followed by 36 months of supervised release. In addition, the Government would ask that the firearms and ammunition identified in the parties' plea agreement be forfeited.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: *\/s/ M.E. Bultemeier*

Mary Elizabeth Bultemeier
DC Bar No. 1724887
Assistant United States Attorney
601 D Street NW
Washington, D.C. 20530
202-252-6731
Mary.bultemeier@usdoj.gov